**UNITED OPERATING COMPANY, Plaintiff,**

v.

**William G. KARNES et al., Defendants.**

**No. 77 Civ. 1663 (GLG).**

United States District Court, S. D. New York.

Jan. 10, 1980.

As Amended Jan. 10, 1980.

Levy & Levy, New York City, for plaintiff; Morris J. Levy, New York City, of counsel.

Lord, Day & Lord, New York City, for defendants; Michael J. Murphy, Stephen J. Crimmins, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Plaintiff commenced this shareholders' derivative suit on April 6, 1977. The gravamen of the complaint was that the individual defendants (officers and directors of the company) had caused the Beatrice Foods Co. to give discounts to dairy customers in order to obtain their business. (Dairies are subject to regulation in some states with respect to wholesale prices.) As is customary in this type of litigation, these questionable payments had not been reported in previous 8–K statements filed by the corporation with the Securities and Exchange Commission.* The relief sought was to set aside stockholder approval of executive. compensation plans which had been solicited without revealing the questionable payments and practices. (This would allegedly be a violation of sections 10(b) and 14(a) of the Securities Exchange Act of 1934.)

The initial weakness in the complaint was the premise that stockholders would be so outraged by the unethical business practices of management designed to increase the corporation's profits that they would refuse to approve compensation for the executives and would reject their corrupt leadership. While this is an inspiring view of the ethics of the market place, it is not a realistic one. Indeed, the shareholders overwhelmingly approved another executive compensation plan after the matter of the discounts was fully disclosed. (As a matter of fact, this has been the pattern in all of the foreign

---

\* An 8–K statement filed in the month of February, 1977 disclosed the previously unreported payments and this litigation was thereafter commenced.

bribe, political contribution, and other illegal-payment type cases that have been brought in the wake of Securities and Exchange Commission investigations.) Furthermore, a substantial legal question could be raised as to whether the laws prohibiting the dairy discounts were in effect constitutional. *See, e. g., Gillette Dairy, Inc. v. Nebraska Dairy Products Board,* 192 Neb. 89, 219 N.W.2d 214 (1974); *Alabama Dairy Commission v. Food Giant Inc. v. Wm. J. Baxley,* Ala.Civ. Action 31859 (10th Cir., March 3, 1977).

Additional defenses to the suit rapidly developed. A Special Committee of outside directors of the company was appointed to conduct an extensive investigation. With the assistance of outside counsel and auditors they ultimately concluded that the continuation of the action was not in the best interests of the company or its shareholders. In the first place, the business judgment rule (*see, e. g., Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Galef v. Alexander,* Fed.Sec.L.Rep. (CCH) ¶ 96,758 (S.D.N.Y.1979)) appeared to bar the action. In addition, it was questionable whether there was federal securities law jurisdiction considering that the alleged deceptions were not made in connection with the purchase and sale of a security. Finally, the common law claim for corporate waste foundered on the obvious proposition that the disputed practices in all likelihood produced profits for the company, rather than losses.

■ Eventually plaintiff's counsel came to the conclusion that it would be in the best interests of the company and its shareholders to dismiss the action. After notice to shareholders the Court conducted a hearing on December 14, 1979 and approved the settlement. No shareholder appeared or objected to the settlement, but some shareholders wrote to express their vigorous disapproval of the payment of any fee to plaintiff's counsel. (Interestingly, most of these letters came from shareholders who were attorneys.) The stipulation disposing of the action provided that plaintiff's counsel would request a fee award of $125,000

and that the corporation would not oppose this application. The propriety of the requested fee is the only remaining issue in this litigation. It is an issue addressed to the discretion of the Court in the exercise of its equitable powers. *Levin v. Mississippi River Corp.,* 377 F.Supp. 926, 931 (S.D.N.Y.), *aff'd without opinion,* 508 F.2d 836 (2d Cir. 1974), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1575, 43 L.Ed.2d 781 (1975); *Lewis v. Bergethon,* Fed.Sec.L.Rep. (CCH) ¶ 96,289 (S.D.N.Y.1978); *Barnett v. Pritzker,* 73 F.R.D. 430, 432 (S.D.N.Y.1977); *Voege v. Ackerman,* 70 F.R.D. 693 (S.D.N.Y.1976).

■ Although the action has been discontinued, plaintiff's counsel maintains that the corporation has received a substantial benefit as the result of the litigation. The benefit is that, subsequent to the commencement of the action, and as a result thereof, the board of directors of the company formed a Special Committee to investigate the situation. With the assistance of an outside firm of certified public accountants, new auditing procedures have been developed which will control the making of illegal discounts in the future. (It is, of course, unquestioned that, to warrant an attorney's fee in a derivative action, the benefit to the corporation need not have a specific monetary value. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Lewis v. Bergethon, supra.*) While this is undoubtedly of some benefit to the company and its shareholders, however, in light of the realities of the market place, it cannot be said to be an income producing one. Indeed, the major benefit to the company is the termination of this expensive and time-consuming litigation. *Lewis v. Newman,* 59 F.R.D. 525, 529 (S.D.N.Y.1973).

■ In support of their claim for $125,-000 in attorneys' fees, plaintiffs claim a total of 911 hours on the part of the two partners in the firm. A perusal of the time sheets submitted indicates that most of this time was spent in "reviewing documents" (otherwise unspecified). The time claimed is 25% more than that put in by the large corporate law firm representing the defend-

ant. Moreover, while defendants' legal time was primarily that of an associate, the plaintiff's counsel's claimed time is primarily that of the senior partner, for which he claims a reasonable hourly rate of $175 an hour.** Since the Second Circuit's opinion in *City of Detroit v. Grinnell*, 495 F.2d 448 (2d Cir. 1974) has placed its emphasis upon attorneys' hours and reasonable charges, it is noticeable that the amount of time claimed in these cases has been growing. Considering that the litigation result in this case was to march up the hill, and then to turn and march down again, it is hard to justify the amount of time claimed in this action. In any event, the benefit to the corporation is probably the limiting factor upon the appropriateness of a fee to be allowed in this case. *Landau v. Chase Manhattan Bank*, 556 F.2d 664 (2d Cir. 1977) (per curiam); *Lewis v. Bergethon, supra; Voege v. Ackerman*, 70 F.R.D. 693, 695 (S.D.N.Y.1976); *Whittemore v. Sun Oil Co.*, 58 F.R.D. 624 (S.D.N.Y.1973).

Moreover, the Court is not unmindful of the complaints of the individual stockholders who urge that no fee be awarded in this situation since the suit was unwarranted and that to pay a fee in these circumstances merely encourages meritless litigation. It does stand to reason that, if a contingency increment is given to successful litigation, some penalty should be available for what is substantially unsuccessful litigation. (If the case had been tried and lost, plaintiff's counsel could still have made a fee application, but his chances of any substantial recovery would not have been great.)

The basic dilemma faced by the Court is that, if it disallows a fee application in situations such as this, plaintiff's counsel in the future will be compelled to continue litigation, rather than abandon all hope of a fee. Consequently, the Court believes that plaintiff's counsel should receive some fee, but nothing approaching that requested. The Court concludes, after evaluation of all of the factors, that a fee of $40,000 would

be appropriate. To this should be added disbursements in the amount of $503.18.

SO ORDERED.

---

** In the large and prestigious New York law firms, such charges for a senior partner's time are not at all uncommon. However, for a small two-man firm, it appears dubious whether such a rate could be routinely commanded from paying clients.