COCA–COLA BOTTLING COMPANY, OF PORTLAND, INDIANA, INC., Coca–Cola Bottling Company of Chicago, and Hondo Incorporated, Appellants–Defendants and Cross–Claimants Below,

v.

CITIZENS BANK OF PORTLAND, Appellee–Cross–Claim Defendant Below.

Sidney and Lois Eskanazi, Appellees–Plaintiffs Below.

No. 29A02–9006–CV–368.

Court of Appeals of Indiana, Second District.

Dec. 31, 1991.

Rehearing Denied March 30, 1992.

David R. Day, John F. Joyce and Andrew W. Hull, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, for appellants-defendants.

Brian K. Burke and Kevin M. Toner, Baker & Daniels, Indianapolis, for appellee.

SHIELDS, Judge.

Coca–Cola Bottling Company of Portland, Inc. (Coke Portland), Coca–Cola Bottling Company of Chicago (Coke Chicago), and Hondo Incorporated (Hondo) appeal the trial court's grant of summary judgment in favor of Citizens Bank of Portland (Citizens). We reverse and remand for further proceedings consistent with this opinion.

## ISSUES

1. Whether acceleration, by definition, precludes the use and imposition of any other remedy.

2. Whether Coke Portland's detrimental reliance on Citizens' acceleration notice could estop Citizens from rescinding its acceleration.

## STATEMENT OF THE CASE

The Board of Commissioners of Jay County, Indiana and Coke Portland entered into a loan agreement dated August 1, 1981 (Loan Agreement). The Board of Commissioners agreed to loan Coke Portland the proceeds received from the Board's issuance of tax-exempt revenue bonds pursuant to a Mortgage and Indenture of Trust (Indenture) dated August 1, 1981. Coke Portland planned to use these proceeds to build a bottling plant in Jay County, Indiana and agreed to pay principal and interest when due to the appointed trustee.

In addition to the Loan Agreement, Coke Portland signed a promissory note (Note) for $1,500,000.00 plus interest and designated certain personal property and real estate as security in the granting clauses of the Indenture. An irrevocable letter of credit was issued by Merchants National Bank to guarantee payment on the bonds. Sidney D. and Lois Eskanazi purchased all the bonds.

Under the Indenture, the Board of Commissioners assigned the Note and its rights under the Loan Agreement to Citizens, the Trustee. Citizens assumed responsibility to oversee the performance of Coke Portland's loan obligations, and Coke Portland pledged to Citizens all the bottling plant property as assurance that it would meet those obligations.

Except for circumstances not relevant here, Section 9.1 of the Loan Agreement prohibited any prepayment prior to July 31, 1991.[1] Upon default, the acceleration

---

1. Section 9.2 of the Loan Agreement permitted       prepayment if: 1) a substantial part of the

clause of the Indenture allowed Citizens to declare the principal and accrued interest immediately due and payable as liquidated damages. Indenture, § 8.02. All funds received by Citizens pursuant to action taken, less cost and expenses incurred for collection of the funds, were to be deposited in a bond fund and distributed as specified, beginning with interest payments to the Eskanazis. Indenture, § 8.07(a). If the principal on the bonds was declared due and payable, then all money received would be applied to the payment of principal and interest "then due and payable." Indenture, § 8.07(b). However, § 8.07(c) states,

> If the principal of all the Bonds shall have been declared due and payable, *and if such declarations shall thereafter have been rescinded and annulled under the provisions of this Article then, subject to the provisions of Section 8.07(b) hereof in the event that the principal of all the Bonds shall later become due or be declared due and payable, the moneys shall be applied in accordance with the provisions of Section 8.07(a) hereof.*

(emphasis added).

Sections 8.10 and 8.11 of the Indenture granted the trustee the right to discontinue or abandon for any reason any proceedings taken to enforce any right and the discretion to waive any event of default and rescind any declaration of maturity of principal,

> provided, however that there shall not be waived ... any default in the payment when due of the interest on any such Bonds unless prior to such waiver or rescission all arrears of interest, or overdue installments of interest or all arrears of payments of principal when due, as the case may be, and all expenses of Trustee, in connection with such default shall have been paid or provided for, and in cases of any such waiver or rescission ... then and in every such case Issuer,

Trustee and the Bondholders shall be restored to their former positions and rights.

Indenture, § 8.11.

If Coke Portland failed to act in accordance with the Loan Agreement, the trustee could invoke one or more of the provided remedies. The trustee could (1) accelerate the loan and declare the outstanding principal and interest thereon as "immediately due and payable as liquidated damages"; and/or (2) take whatever action at law or equity it deemed appropriate or necessary to recover amounts due without actual acceleration of the total debt. Loan Agreement, § 8.2. If Coke Portland failed to pay the accelerated amount, the trustee could initiate foreclosure proceedings on the Indenture. Indenture, § 8.03.

No remedy, by the terms of the Indenture and the Loan Agreement, was exclusive of any other remedy; they were cumulative and in addition to any other remedy existing at law or equity. Furthermore, no delay or omission to exercise any right arising from any default would impair or constitute a waiver of that right, "but any such right and power may be exercised from time to time and as often as may be deemed expedient." Loan Agreement, § 8.3; Indenture, § 8.04.

Coke Portland had suffered financial problems since the late 1970s which it had hoped would change with the consolidation of the bottling plant in Portland and a plant in Union City, Indiana, and with the new construction in Jay County. However, Coke Portland continued to have difficulty making the monthly interest payments on time and received several late notices from Citizens warning Coke Portland of the potential consequences for nonpayment. Coke Portland sought the assistance of Coca–Cola USA (a non-party to this suit) who bought Coke Portland's outstanding voting shares, paid off its $1,200,000.00 revolving line of credit with Merchants Na-

project was destroyed or damaged to make it irreparable; 2) the project was condemned or subject to a taking by eminent domain; 3) certain economic, technological, or other changes rendered the project's purpose obsolete; 4) changes in the law voided or made it impossible to perform; 5) unreasonable burdens or excessive liabilities, e.g., taxes, were imposed which did not exist at the time of signing; or 6) interest on the bonds became subject to federal income tax.

tional Bank, and replaced its board of directors. Nonetheless, Coke Portland continued to operate at a loss, prompting more warnings from Citizens.

On June 5 or 6, 1986, all outstanding shares of Coke Portland were acquired by Portland Acquisition Corporation, a wholly-owned subsidiary of Hondo. Portland Acquisition Corporation then merged into Coke Portland, with the latter remaining as the surviving entity. Coke Portland retained full responsibility for its financial obligations.

At the time they purchased the bonds, the Eskanazis did not inquire as to the financial stability of Coke Portland, requiring only that they receive fourteen percent interest on "no call" bonds.

Coke Portland's financial insolvency prompted Marvin Herb, Hondo's sole shareholder and Coke Portland's president, to instruct Coke Portland to stop its interest payments to Citizens in the hope that Citizens would accelerate the loan obligation. On November 6, 1986, Citizens sent a written notice to Coke Portland, accelerating the debt and demanding full and immediate payment of the principal and accrued interest. Letters were sent to the Eskanazis, the Jay County Board of Commissioners, and Merchants National Bank, informing them of the accelerated debt. Suzan Dillon Myers, the trust officer for Citizens responsible for handling the Coke account, then spoke with Mr. Eskanazi who expressed his displeasure at the acceleration but did not tell her to rescind the acceleration or that he would send further instructions with regard to how she should proceed.

On November 7, 1986, Coke Portland paid $1,056,586.72 to Citizens. Coke Portland had borrowed the funds from Coca–Cola Indianapolis.[2] Tom Martin, Hondo's chief financial officer, spoke with Mr. Eskanazi that evening, at which time Mr. Eskanazi expressed his displeasure over the acceleration notice.

In late November of 1986, Coke Portland's attorney sent a written demand to Citizens for the return of the original bond documents and release of the lien. Citizens did not comply, and its attorney had several discussions with Mr. Eskanazi regarding Citizens' future course of action. Mr. Eskanazi advised Citizens to do nothing until he sought legal advice.

However, by that time, in addition to accepting the funds in early November, Citizens had liquidated trust assets and wired the funds to the Eskanazis' account at Merchants National Bank in Indianapolis. The Eskanazis refused to accept the funds and ordered their return. In December of 1987, the Eskanazis' attorney instructed Citizens to rescind the acceleration. Citizens sent a letter dated February 16, 1988 to Coke Portland to that effect. On March 3, 1988, Citizens sought to return to Coke Portland the funds tendered by Coke Portland in 1986, plus interest accrued and less interest paid to the Eskanazis for their bond interest coupons. Coke Portland refused to accept the funds. Citizens deposited the funds in an interest-bearing account and used the monies to pay monthly interest installments to the Eskanazis. Meanwhile, Citizens refused to release any liens on Coke Portland's property, cancel the letter of credit securing the bond indebtedness, or return to Coke Portland the excess of the amount it had paid to satisfy the acceleration notice.

The Eskanazis brought suit against Coke Portland, Hondo, and Coke Chicago (the "Coke Defendants"). Hondo and Coke Chicago were joined based on the Eskanazis' belief they had ownership interests in Coke Portland and had either ratified or participated in the alleged acts. The complaint alleged the Coke Defendants were guilty of bad faith and unfair dealing by engineering a "sham" default to avoid the no-call provisions in the loan documents and had committed fraud by deceiving Citizens into accelerating the debt. The Eskanazis sought to reinstate the loan documents to require semi-annual interest payments as if the acceleration and payment had never oc-

---

**2.** Coke Portland also executed a promissory note dated November 7, 1986 to Coca–Cola Indianapolis for the funds used to pay the acceler-

ated demand and paid interest at a rate of 7.50% but not to exceed 8.75%.

curred. An amended complaint sought reimbursement of litigation expenses, punitive damages for the Coke Defendants' tortious breach of contract, and treble damages for using fraud and deception to "derive an unconscionable financial advantage against [the Eskanazis]." Record at 103.

In addition to a counterclaim against the Eskanazis, the Coke Defendants filed a cross-claim, subsequently amended, against Citizens which demanded, among other things, an accounting for the funds tendered to Citizens and a return of the excess amount, a judgment against Citizens for any liability the Coke Defendants might have to the Eskanazis, and a declaratory judgment as to the respective rights of the Coke Defendants and Citizens.

Cross-claim defendant Citizens filed a motion for summary judgment as to all counts of Coke Portland's amended cross-claim. The trial court granted summary judgment in favor of Citizens, reinstated the loan documents as if the acceleration had not occurred, and ordered Coke Portland to pay all sums necessary for Citizens to distribute to the Eskanazis the $1.5 million principal amount of the bonds plus fourteen percent annual interest through July 31, 1991. The trial court held Citizens' acceleration of the debt did not operate as an estoppel, an irrevocable election of remedies, or a waiver. Furthermore, the trial court declared the Coke Defendants had no claim for relief because they had not completely fulfilled their obligations. The Coke Defendants appeal.

## DISCUSSION

On review of the trial court's grant of summary judgment, this court must use the same standards as the trial court and consider the pleadings, depositions, affidavits, and admissions in a light most favorable to the non-moving party. *Parke v. First National Bank of Elkhart* (1991), Ind.App., 571 N.E.2d 1317, 1319.

The party seeking summary judgment carries the burden of establishing there is no issue of material fact and that the party is entitled to judgment as a matter of law. *McCae Management Corp. v. Merchants National Bank and Trust Co.* (1990), Ind. App., 553 N.E.2d 884, 886. The nonmoving party has the burden to show the presence of a disputed material fact only if the moving party fulfills these two burdens. *Id.* All evidence must be construed in favor of the nonmovant, and all doubts as to the existence of a material issue must be resolved against the movant. Further, if conflicting inferences arise from the undisputed facts, summary judgment is inappropriate. *Id.*

The Coke Defendants claim the trial court's judgment is erroneous because Citizens accelerated its indebtedness, and Coke Portland paid Citizens the principal and interest due, thereby discharging its debt. Citizens responds it rescinded its acceleration of Coke Portland's indebtedness as provided in the loan documents, and, therefore, the parties stand in the same position as they were before acceleration. The Coke Defendants reply Citizens' acceleration was irrevocable because it detrimentally relied and acted upon the acceleration. Citizens' answer to that argument is that the undisputed facts establish Coke Portland did not detrimentally rely upon its acceleration nor could it because it intentionally defaulted. The Coke Defendants' answer is that genuine issues of material fact exist as to the possibility of a contrived default and as to any detrimental reliance resulting from the chosen acceleration remedy. Finally, Citizens claims that even if its acceleration is irrevocable, acceleration is not an exclusive remedy, thus entitling Citizens to its damages, and further, the loan documents establish a duty to pay interest irrespective of acceleration.

### I.

Our initial determination is whether acceleration is an exclusive remedy. If it is not an exclusive remedy, the issue of detrimental reliance is of no consequence because other remedies are available; if it is an exclusive remedy, detrimental reliance is an issue.

Citizens argues the loan documents explicitly provide that no remedy is intended to be exclusive of any other remedy avail-

able to the trustee but instead is in addition to all other remedies granted under the loan documents or existing at law or equity. Thus, Citizens claims it is entitled to interest, as agreed for the full term of the bonds, even if its acceleration is irrevocable in order that it receive the benefit of its bargain.

A nonexclusivity of remedy provision is limited when the non-defaulting party chooses acceleration as a method of recovering the amount owed to it, because "acceleration, by definition, advances the maturity date of the debt, and, as a result, payment is not a prepayment but rather a payment made at or after maturity." *First Indiana Federal Savings Bank v. Maryland Development Co.* (1987), Ind.App., 509 N.E.2d 253, 257; *Baybank Middlesex v. 1200 Beacon Properties, Inc.* (1991), D.Mass., 760 F.Supp. 957, 966. Because the defaulting party is forced to pay the debt upon acceleration, the non-defaulting party's election to accelerate that debt waives its opportunity to earn interest payable over a number of years in exchange for immediate payment of the outstanding principal and accrued interest. "[W]hen lenders accelerate the maturity of the debt, they waive their opportunity to earn, and their claim to interest payable over a period of years in exchange for the immediate payment of the outstanding principal and accrued interest. *See [In re] LHD Realty,* [*Corp.* (1984), 7th Cir.] 726 F.2d [327] at 331." *Baybank Middlesex,* 760 F.Supp. at 966.

In *Baybank Middlesex,* a dispute arose between 1200 Beacon Properties, Inc. (Beacon) and Guardian Life Insurance Company of America (Guardian Life) concerning tax-exempt bonds issued to finance the renovation and addition to a hotel located at 1200 Beacon Street, Brookline, Massachusetts (Project). Massachusetts Industrial Finance Agency (MIFA) issued the bonds pursuant to a Mortgage and Trust Indenture. Beacon received proceeds from Guardian Life's purchase of the bonds under a Loan Agreement between MIFA and Beacon. The "event of default" terms of the Indenture and the Loan Agreement included a mandatory acceleration clause in the event the interest on the bonds was disqualified for a federal tax exemption. The instruments also provided that interest would accrue at the existing rate until the trustee received the outstanding principal and interest (and a taxability premium) as of the accelerated maturity date, and that no remedy was exclusive of any other remedy but rather was cumulative and in addition to any other remedy. The financing documents did not expressly provide for voluntary prepayment of the indebtedness.

In December of 1986, an event of default occurred. On March 19, 1987, the trustee accelerated the bonds and demanded the outstanding principal, accrued interest, and the three percent taxability premium. On March 20, 1987, Beacon tendered the requested amount. Then, in October of 1989, Guardian Life filed a complaint against Beacon seeking as damages the difference between the contract rate of interest and the prevailing rate of interest on a similar grade investment for the remaining loan term. The federal district court held that although the plain meaning of the nonexclusivity provisions entitled Guardian Life to pursue any and all remedies available to recover all amounts due, the accelerated maturity date limited Guardian Life's recovery exclusively to the principal, accrued interest, and the taxability premium; a lender loses its right to receive unearned or future interest once it elects to accelerate the maturity of the debt, since "[u]pon acceleration, the borrower is not choosing to pay early; he is forced to pay because the debt has become due." *Id.* at 966.

The court rejected Guardian Life's argument that allowing acceleration to preclude all other remedies would encourage borrowers to intentionally default on their obligations to avoid liability for unearned interest and take advantage of lower market interest rates. The court reasoned that the acceleration clause need not have been self-operative, i.e., the creditor, and not the debtor, could have had the option to determine when the acceleration provision, inserted for the creditor's benefit, should become operative. In fact, courts occasionally have attempted to avoid the harsh ef-

fects of an agreement which arguably includes an automatic acceleration · clause and, accordingly, deprives the creditor of a desirable investment upon the debtor's default, by construing the clause to not be self-operative. *See, e.g., Grozier v. Post Publishing Co.* (1961), 342 Mass. 97, 172 N.E.2d 266.

Nevertheless, an acceleration provision may be so specific in its phrasing that acceleration is compelled upon default, i.e., the provision will be construed literally and enforced according to its terms. *Baybank Middlesex*, 760 F.Supp. at 967. In addition, any concerns the *Baybank Middlesex* court might have had over a borrower's ability to intentionally default were allayed by the risk a borrower runs of not being able to repay the loan upon acceleration as a result of which the borrower may lose its investment through foreclosure and may also lose its credit rating. Hence, the court concluded that after the maturity of the debt by acceleration, the lender loses its right to receive unearned or future interest. "It is well-settled ... that there are some limitations upon the right of a lender to receive unearned interest or a prepayment premium on a fixed debt obligation.... One such limitation is that a lender loses its right to receive unearned or future interest when it elects to accelerate the maturity of a debt." *Id.* at 966. By receiving the outstanding principal, accrued interest, and the taxability premium, the court held the creditor received the benefit of the bargain as contemplated by the parties under the specific terms of their agreement.

We find the reasoning of *Baybank Middlesex* persuasive. Therefore, we conclude that once Citizens chose to accelerate the maturity date and make Coke Portland's debt "immediately due and payable," and assuming for the purpose of this issue that Citizens could not rescind its acceleration because Coke Portland reasonably relied and acted upon the acceleration to its detriment, Citizens could not pursue any other remedy because other remedies were not available. Citizens lost its right to receive unearned future interest when it elected to accelerate the maturity of the debt. Accel-

eration, when acted upon, by maturing the debt, precludes any other remedy; the parties are receiving the benefit of the bargain as contemplated by the specific terms of their agreement by the acceleration.

## II.

### A.

■ We have determined acceleration is an exclusive remedy; therefore, we must determine whether Coke Portland's acceleration could be irrevocable. An election to accelerate a debt may become irrevocable if the election reasonably causes the defaulting party to rely and act upon the acceleration to its detriment. In *Kilpatrick v. Germania Life Insurance Co.* (1905), 183 N.Y. 163, 75 N.E. 1124, a mortgagor defaulted and the mortgagee initiated foreclosure proceedings, claiming the principal sum, with all arrears of interest, immediately due and payable by reason of the default. Sometime later, the mortgagor tendered the entire amount of principal and interest. The mortgagee stated he had withdrawn the foreclosure proceedings, refused the tender, and demanded, in addition, the payment of the prepayment penalty provided in the mortgage note. The evidence revealed that after the foreclosure proceedings were commenced, the mortgagor "had changed his position, had obligated · himself to make a new loan on the mortgaged premises, and necessarily had contracted financial obligations in that connection." *Kilpatrick*, 183 N.Y. at 168, 75 N.E. at 1125. Based upon this evidence, the court held "[t]he election made by the [mortgagee] at that time to treat the mortgage debt as due became final and irrevocable after [mortgagor's] change of position and assumption of legal obligations, the direct result of that election." *Id.; See also In re LHD Realty Corp.* (1984), 7th Cir., 726 F.2d 327, 331 n. 4 ("Even after acceleration, a lender may be able to regain its right to a premium by revoking its acceleration and reinstating the mortgage prior to detrimental reliance by the borrower on the acceleration.") (citing *Berenato v. Bell Savings & Loan Ass'n* (1980), 276

Pa.Super. 599, 419 A.2d 620, 622); *Van Vlissingen v. Lenz* (1898), 171 Ill. 162, 167, 49 N.E. 422, 423 ("[U]nder some circumstances the law will not permit a party, having once elected, to change such election, but will hold it irrevocable. This rule is generally applicable ... where the opposite party would be in some way prejudiced by permitting him who has the right to elect to revoke such election."). We presume the parties could waive the protection afforded by the doctrine of detrimental reliance by clear and unequivocal language to that effect. However, the subject loan documents do not include any such provision. Because the parties' contractual intentions are determined from the four corners of the documents, which are presumed to contain their entire agreement, *McCae Management Corp.*, 553 N.E.2d at 887, the parties' agreement is subject to the doctrine that an election to accelerate a debt is not rescindable if the defaulting party has reasonably relied and acted upon the acceleration to the detriment of the defaulting party.

### B.

▮ Conflicting inferences arise from the undisputed facts relevant to Coke Portland's claim it reasonably, to its detriment, relied and acted upon Citizens' acceleration. A minimal listing of some of the material, conflicting inferences which arise from the undisputed facts include: when did Coke Portland incur the indebtedness to Coke Indianapolis; would it have incurred the additional indebtedness without acceleration; when was it, or should it have been, aware the acceleration would be rescinded; was Coke Portland's default intentional or just a question of time. These material conflicting inferences render the grant of summary judgment erroneous.

Judgment reversed and remanded for further proceedings.

CHEZEM and SULLIVAN, JJ., concur.