INDIANA BELL TELEPHONE COMPANY, INCORPORATED, d/b/a/ Ameritech Indiana, Appellant–Respondent,

v.

TIME WARNER COMMUNICATIONS OF INDIANA, L.P., Appellee–Complainant.

No. 93A02–9907–EX–460.

Court of Appeals of Indiana.

April 14, 2003.

Michael R. Fruehwald, Barnes & Thornburg, Brian D. Robinson, Ameritech

Indiana, Indianapolis, IN; Of Counsel: Theodore A. Livingston, John E. Muench, Demetrios G. Metropoulos, Mayer Brown Rowe & Maw, Chicago, IL, Attorneys for Appellant.

David L. Steiner, Office of Indiana Attorney General, Indianapolis, IN, Attorney for Appellee, Indiana Utility Regulatory Commission.

Clayton C. Miller, Baker & Daniels, Indianapolis, IN, Douglas W. Trabaris, AT&T Corporation, Chicago, IL, Attorneys for Appellee, TCG Indianapolis.

## OPINION

BARNES, Judge

### Case Summary

Indiana Bell Telephone Company, d/b/a Ameritech Indiana ("Ameritech"), appeals an order of the Indiana Utility Regulatory Commission ("IURC") requiring Ameritech to pay reciprocal compensation to a competing telecommunications provider, Time Warner Communications of Indiana ("Time Warner"), for calls placed by Ameritech's customers to Internet service provider ("ISP") customers of Time Warner. We affirm.

### Issue

The sole restated issue for our review is whether the IURC properly interpreted the interconnection agreement between Ameritech and Time Warner, which was entered into pursuant to the Telecommunications Act of 1996 ("1996 Act"), as requiring reciprocal compensation for ISP-bound traffic.

### Facts

▇▇▇ "The Telecommunications Act of 1996 ... created a new telecommunications regime designed to foster competi-

tion in local telephone markets." *Verizon Maryland, Inc. v. Public Serv. Comm'n of Maryland,* 535 U.S. 635, 638, 122 S.Ct. 1753, 1756, 152 L.Ed.2d 871 (2002). Under the 1996 Act, incumbent local-exchange carriers ("ILECs") have a duty to share their pre-existing telephone networks with competing local-exchange carriers ("CLECs"). *Id.;* 47 U.S.C. § 251(c). To implement the 1996 Act's competition scheme, ILECs are required to enter into interconnection agreements with a CLEC that wishes to access the ILEC's market, so that a customer of an ILEC who wishes to call a customer of a CLEC may do so, and vice versa. *Southwestern Bell Tele. Co. v. Public Util. Comm'n of Texas,* 208 F.3d 475, 477 (5th Cir.2000). Such agreements must provide for reasonable reciprocal compensation. 47 U.S.C. §§ 251(b)(5) and 252(d)(2)(A). "Reciprocal compensation" means that "[w]hen an LEC's customer places a local call to a customer of another LEC, the LEC whose customer initiated the call compensates the receiving LEC for transporting and terminating the call through its network." *Southwestern Bell,* 208 F.3d at 477.

Ameritech, an ILEC, entered into an interconnection agreement with Time Warner, a CLEC, in July 1996. Section 5.11 of the agreement addresses "Reciprocal Compensation Arrangements—Section 251(b)(5)," and states, "Ameritech's and [Time Warner]'s compensation for transport and termination on their respective networks of all Local Traffic exchanged between [Time Warner] and Ameritech shall be determined as set forth in the Pricing Schedule." R. p. 50.[1] "Reciprocal Compensation" is defined elsewhere as being "As Described in the Act." R. p. 45. "Local Traffic" is defined as meaning "lo-

---

1. Because this appeal was initiated before the effective date of our new appellate rules on January 1, 2001, the prior rules govern this appeal and a record as required by those rules, instead of an appendix and transcript, has been submitted to this court.

cal service area calls as defined by the [IURC]." R. p. 43. The crux of the dispute in this case, as it has been in numerous disputes between ILECs and CLECs throughout the country, is whether a telephone call from a customer of an ILEC to an ISP that is a customer of a CLEC is a call for which the ILEC must pay reciprocal compensation to the CLEC under the terms of the parties' interconnection agreement. It would appear that many such agreements executed in 1996 or thereabouts failed to specifically address the question of whether calls to ISPs constituted "local traffic" or were non-local, with reciprocal compensation being required only for "local traffic." In a simplified nutshell, these disputes have arisen because from one perspective calls to an ISP usually are "local," toll-free, and not seen as long distance by the customer calling the ISP. On the other hand they are also non-local, because the ISP itself connects the customer to the World Wide Web, meaning a caller in Indianapolis eventually may connect with a web site based in Los Angeles, for example, or as far away as Timbuktu.

In 1997, Ameritech announced to Time Warner and other CLECs that it did not intend to pay reciprocal compensation for calls placed by its customers to ISPs serviced by CLECs. On January 5, 1998, Time Warner filed a complaint with the IURC seeking a ruling that its interconnection agreement with Ameritech required Ameritech to pay reciprocal compensation to Time Warner for local calls Ameritech's customers placed to Time Warner's ISP customers. Several other CLECs who claimed to have substantially similar interconnection agreements with Ameritech filed petitions to intervene in

the proceedings, including TCG Indianapolis, d/b/a AT&T ("AT&T"), which petitions were granted. Time Warner moved for summary judgment on its complaint. On February 3, 1999, the IURC granted Time Warner's motion, concluding, inter alia, that calls from Ameritech's customers to Time Warner's ISP customers were "Local Traffic subject to reciprocal compensation." R. p.1928.

On February 23, 1999, Ameritech asked the IURC to reconsider its February 3 order. On February 26, 1999, the Federal Communications Commission ("FCC") issued a "Declaratory Ruling" that stated, in part, "ISP-bound traffic is jurisdictionally mixed and appears to be largely interstate," but that "In the absence, to date, of a federal rule regarding the appropriate inter-carrier compensation for this traffic, we therefore conclude that parties should be bound by their existing interconnection agreements, as interpreted by state commissions." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 1999 WL 98037, ¶ 1. On June 9, 1999, the IURC concluded that the FCC's ruling did not affect its February 3, 1999 order, and declined to reconsider that order. Ameritech initiated an appeal to this court and also filed suit in the United States District Court for the Southern District of Indiana, pursuant to 47 U.S.C. § 252(e)(6). We granted Ameritech's motion to stay consideration of this appeal on August 30, 1999. On April 4, 2001, we received notice that Time Warner had settled with Ameritech. Time Warner was dismissed as a party, with the appeal remaining as to Ameritech and the intervenors in the IURC proceeding.[2] On August

---

2. Only AT&T, joined by the IURC, has filed an appellee's brief with this court, although several other parties had intervened below. The

other intervenors are still parties in this appeal, however, in the absence of any specific notification to this court otherwise and re-

22, 2002, after the action in the federal district court was dismissed, we resumed consideration of this appeal.

### Analysis[3]

■ Ameritech argues that the IURC, as a matter of Indiana contract law, erred in reading its interconnection agreement with Time Warner as requiring reciprocal compensation for ISP-bound telephone traffic because the Act does not require reciprocal compensation for such traffic and the parties intended to limit reciprocal compensation only to what is required by the Act. Initially, we address the conflicting standards of review the parties propose. Ameritech asks us to review the IURC's decision de novo, because it concerned the interpretation of a contract and thus addressed a pure question of law requiring no deference to the administrative agency. *See Cowper v. Collier,* 720 N.E.2d 1250, 1255 (Ind.Ct.App.1999), *trans. denied* (2000). AT&T urges that we review the decision under an arbitrary and capricious standard; however, it cites no authority for applying this standard. In fact, the usual standard of review for IURC decisions is two-fold: first, whether the decision is supported by specific findings of fact and sufficient evidence, and second, whether the decision is contrary to law. *Knox County Rural Elec. Membership Corp. v. PSI Energy, Inc.,* 663 N.E.2d 182, 189 (Ind.Ct.App.1996), *trans. denied.* That standard is inapplicable here, with the case having been resolved on summary judgment.[4]

■ The standard of review for summary judgment orders under Indiana Trial Rule 56 is de novo, and we must determine that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law to affirm a grant of summary judgment. *See Greater Hammond Cmty. Servs., Inc. v. Mutka,* 735 N.E.2d 780, 782 (Ind.2000). We are aware that this is not a typical contract at issue here because it is intertwined to a certain degree with statutes and regulations that the IURC is charged with administering, which might ordinarily require some deference to its reading of the contract. *See Department of Natural Res. v. Peabody Coal Co.,* 740 N.E.2d 129, 134 (Ind.Ct.App.2000). Nevertheless, because this case involved the interpretation of a written contract decided on summary judgment, and because AT&T cites no authority for applying its suggested arbitrary and capricious standard of review, we grant Ameritech the benefit of the doubt and review the IURC's decision de novo.

Whether reciprocal compensation is due for ISP-bound traffic is an issue that has

gardless of their failure to actively participate in the appeal. *See State v. Nixon,* 270 Ind. 192, 194, 384 N.E.2d 152, 153 (1979). Ameritech also questions IURC's appearance as a party in this appeal from a ruling issued in its adjudicative capacity, citing *City of Terre Haute v. Terre Haute Water Works Corp.,* 133 Ind.App. 232, 180 N.E.2d 110, 111 (1962). Ameritech has never moved to dismiss the IURC as a party, however.

3. No party to this appeal questions our subject-matter jurisdiction to decide this case on principles of state contract law. The 1996 Act does provide that "No State court shall have jurisdiction to review the action of a State commission in approving or rejecting" an interconnection agreement. 47 U.S.C. § 252(e)(4). On its face, it does not preclude state courts from reviewing a regulatory commission's action in resolving a contract dispute about an interconnection agreement.

4. On appeal, although Ameritech argues that the IURC substantively erred by entering summary judgment, it does not challenge the IURC's use of the summary judgment procedure in an administrative setting. *See* Ind. Admin. Code tit. 170, r. 1–1–22(b) (incorporating Indiana Trial Rules "in all cases not specifically provided for" by the IURC's own procedures).

generated voluminous litigation between ILECs and CLECs across the country in the past five years. Some additional background information may be helpful to put this entire question into a framework. The 1996 Act, among other things, imposed a duty on all local exchange carriers "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). State utility regulatory commissions were given the authority to review and approve interconnection agreements between LECs, and were instructed not to "consider the terms and conditions for reciprocal compensation to be just and reasonable unless . . . such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier. . . ." 47 U.S.C. § 252(d)(2)(A)(i). The FCC promulgated a rule limiting the need for reciprocal compensation to "transport and termination of local telecommunications traffic between LECs and other telecommunications carriers." 47 C.F.R. § 51.701(a) (emphasis added). The FCC also issued an order on August 8, 1996, providing that "state commissions have the authority to determine what geographic areas should be considered 'local areas' for the purpose of applying reciprocal compensation obligations under section 251(b)(5), consistent with the state commissions' historical practice of defining local service areas for wireline LECs." *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15,-499, 1996 WL 452885, ¶ 1034 (1996).

Beginning in 1997 or so, it appears that ILECs throughout the country en masse began refusing to pay reciprocal compensation to CLECs for traffic from ILEC customers bound for ISPs serviced by CLECs, claiming that such traffic was not "local." When CLECs challenged the ILECs' actions in state utility regulatory commissions and in court, ILECs almost universally lost. *See, e.g., Illinois Bell Tele. Co. v. WorldCom Tech., Inc.*, 157 F.3d 500, 502 (1998) (noting that as of September 8, 1998, "the score [was] 25–0 against Ameritech and the other Baby Bells" on this issue).

On February 26, 1999, the FCC stepped into the fray. In a declaratory ruling, it made the following comments:

> [W]e conclude that ISP-bound traffic is jurisdictionally mixed and appears to be largely interstate. This conclusion, however, does not in itself determine whether reciprocal compensation is due in any particular instance. As explained below, parties may have agreed to reciprocal compensation for ISP-bound traffic, or a state commission, in the exercise of its authority to arbitrate interconnection disputes under section 252 of the Act, may have imposed reciprocal compensation obligations for this traffic. In the absence, to date, of a federal rule regarding the appropriate inter-carrier compensation for this traffic, we therefore conclude that parties should be bound by their existing interconnection agreements, as interpreted by state commissions.

*In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, ¶ 1 (1999) ("FCC Ruling # 1"). The FCC concluded that "the communications at issue here do not terminate at the ISP's local server, as CLECs and ISPs contend, but continue to the ultimate destination or destinations, specifically at a Internet website that is often located in another state." *Id.* at ¶ 12. The FCC also noted, however, that it had traditionally "treated ISP-bound traffic as though it were local" and

"that our policy of treating ISP-bound traffic as local for purposes of interstate access charges would, if applied in the separate context of reciprocal compensation, suggest that such compensation is due for that traffic." *Id.* at ¶¶ 23, 25. The District of Columbia Circuit Court of Appeals vacated FCC Ruling # 1 and remanded for further proceedings, holding that the FCC had failed to adequately explain why a jurisdictional analysis of ISP-bound traffic was appropriate in the context of not requiring reciprocal compensation. *Bell Atlantic Tele. Cos. v. Federal Communications Comm'n,* 340 U.S.App. D.C. 328, 334, 206 F.3d 1, 7 (2000).

After FCC Ruling # 1, ILECs began persuading some authorities that ISP-bound traffic was not "local" traffic subject to reciprocal compensation under the language of particular interconnection agreements. *See, e.g., In the Matter of Starpower Communications, LLC v. Verizon Virginia, Inc.,* 17 F.C.C.R. 6873, 2002 WL 518062 (2002).[5] However, it would appear that most authorities addressing the issue concluded that FCC Ruling # 1 did not change their view that reciprocal compensation was required for ISP-bound traffic under particular ILEC–CLEC interconnection agreements. *See Southwestern Bell Tele. Co. v. Brooks Fiber Communications of Oklahoma, Inc.,* 235 F.3d 493 (10th Cir.2000); *Southwestern Bell Tele. Co. v. Public Util. Comm'n of Texas,* 208 F.3d 475 (5th Cir.2000); *U.S. West Communications v. MFS Intelenet, Inc.,* 193 F.3d 1112 (9th Cir.1999), *cert. denied,* 530 U.S. 1284, 120 S.Ct. 2741, 147 L.Ed.2d 1005 (2000); *Illinois Bell Tele. Co. v.*

*Worldcom Tech., Inc.,* 179 F.3d 566 (7th Cir.1999), *cert. denied,* 535 U.S. 1107, 122 S.Ct. 2318, 152 L.Ed.2d 1071 (2002); *BellSouth Telecomm. v. ITC DeltaCom Communications,* 62 F.Supp.2d 1302 (M.D.Ala. 1999).

On April 27, 2001, the FCC responded to the remand order and issued a second ruling. It did not attempt to use a jurisdictional analysis of ISP-bound traffic as a justification for excluding it from reciprocal compensation requirements. Instead, the FCC concluded that it had authority to exclude such traffic from reciprocal compensation requirements under sections 251(g) and 251(i) of the 1996 Act. *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 16 F.C.C.R. 9151, 2001 WL 455869, ¶¶ 49–50 (2001) ("FCC Ruling # 2"). In fact, the FCC purported to abandon the distinction between "local" and interstate telecommunications as the relevant factor in determining whether reciprocal compensation on certain traffic is due. *Id.* at ¶¶ 46, 54. The FCC also provided a policy rationale for excluding ISP-bound traffic from reciprocal compensation requirements. The evidence it received before issuing FCC Ruling # 2 indicated such compensation created "market distortions" that were undermining the intentions of the 1996 Act, because CLECs were terminating eighteen times more traffic than they originated, with ninety percent of those terminations consisting of ISP-bound traffic. *Id.* at ¶ 5. Thus, ILECs are subsidizing the CLECs' service of ISPs and receive little to nothing in return. The FCC proposed ending recip-

5. In this order, the FCC held that two interconnection agreements between Starpower and Verizon Virginia did not require reciprocal compensation for ISP-bound traffic, while an interconnection agreement between Starpower and Verizon South did. 17 F.C.C.R. 6873 at ¶ 1. For the sake of clarity, we cite this decision throughout our opinion only for its resolution of the Starpower Verizon Virginia dispute and will refer to it with those parties' names.

rocal compensation for ISP-bound traffic altogether in the future and issued an interim order designed to phase out reciprocal compensation that capped the amount that a LEC could receive for ISP-bound traffic "pursuant to a particular interconnection agreement" from 2001 through 2003. *Id.* at ¶ 78.

Nonetheless, the FCC concluded:

The interim compensation regime we establish here applies as carriers renegotiate expired or expiring interconnection agreements. It does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions. This Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here.

*Id.* at ¶ 82. The D.C. Circuit Court of Appeals again found the FCC's reasons for excluding ISP-bound traffic from reciprocal compensation requirements to be flawed. *WorldCom Inc. v. Federal Communications Comm'n*, 351 U.S.App. D.C. 176, 180–81, 288 F.3d 429, 433–34 (2002). This time, however, the court refused to vacate FCC Ruling # 2, instead simply opting to remand for further proceedings. *Id.* at 181, 288 F.3d at 434. Thus, FCC Ruling # 2 is still in effect; the FCC has not yet responded to the appellate court's remand order.

Taking it for granted that it is now clear that the Act does not require reciprocal compensation for Internet traffic, (although the FCC has never explained this position to the D.C. Circuit Court of Ap-

peals' satisfaction), this conclusion does not address whether the particular interconnection agreement between Ameritech and Time Warner required it nonetheless. The Seventh Circuit has plainly stated that merely because "the Act does not *require* reciprocal compensation for calls to ISPs is not to say that it *prohibits* it." *Worldcom Tech., Inc.*, 179 F.3d at 573 (emphases in original). The Seventh Circuit also chided Ameritech for making practically the identical argument that it makes in this case, namely, that "the Act does not require reciprocal compensation; the agreements precisely track the Act (reciprocal compensation is 'as described in the Act'); therefore the agreements cannot require reciprocal compensation for calls to ISPs." [6] *Id.* The court labeled this "syllogism ... an oversimplification" and rejected the argument outright. *Id.* It also went to address Ameritech's contention that the Illinois Commerce Commission had improperly concluded that the parties intended for reciprocal compensation to apply to ISP-bound traffic. The court did not accept this argument, noting that the Illinois Commerce Commission had properly considered that Ameritech's customers are billed for a local call for calls to an ISP, those customers dial a local number, and the calls are routed over local, not long-distance, telephone lines. *Id.* at 574. "Also quite telling from our point of view is that in the agreements, the parties specifically granted to the [Illinois Commerce Commission] the right to define local traffic for reciprocal compensation purposes." *Id.*

Ameritech attempts to minimize the importance of the Seventh Circuit's decision

---

**6.** One of the interconnection agreements before the Seventh Circuit required "Reciprocal Compensation ... for transport and termination of Local Traffic," with "Reciprocal Compensation" defined as being "As Described in the Act" and "Local Traffic" defined as "local service area calls as defined by the [Illinois Commerce Commission]." 179 F.3d at 572. These definitions are for all relevant purposes indistinguishable from the definitions in the Ameritech–Time Warner interconnection agreement before us.

in *Worldcom* because that court expressly noted that it was analyzing the Illinois Commerce Commission's decision that the parties' interconnection agreements required reciprocal compensation for ISP-bound traffic only for its compliance with federal law, not as a matter of state contract law. That argument is correct, as far as it goes. *See id.* at 572. The key, however, is that Ameritech in this case makes almost precisely the same argument based on the 1996 Act and the rulings of the FCC that the Seventh Circuit flatly rejected in *Worldcom.* Simply by rephrasing the question as one of state contract law does not alter the persuasive effect of the Seventh Circuit's outright rejection of Ameritech's practically identical claims in *Worldcom.* On the one hand, Ameritech wants this court to analyze the contract at issue under state contract law principles and to disregard *Worldcom* because it analyzed similar contracts solely for their compliance with federal law. On the other hand, Ameritech also wants us to analyze the contract by utilizing interpretations of FCC rulings and federal law that cases such as *Worldcom* flatly rejected. Ameritech cannot have it both ways.

We acknowledge that after the Seventh Circuit decided *Worldcom,* the FCC revisited reciprocal compensation for ISP traffic in FCC Ruling #2 and indicated its interest in phasing out such compensation as carrier contracts expired or through change of law provisions in existing carrier contracts. FCC Ruling #2 *"does not alter existing contractual obligations . . . .",* nor does it "preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here." 16 F.C.C.R. ¶82 (emphasis added). As of the ruling's issue date, April 27, 2001, the interconnection agreements between Ameritech and Time Warner and the intervenors such as AT&T had been in effect for several years. None of the parties in this case have identified when their respective interconnection agreements are due to expire. Ameritech's claim that AT&T is trying to "reverse" FCC Ruling #2 is not well taken; AT&T is simply arguing as to the proper interpretation of contracts entered into several years before FCC Ruling #2 and which the FCC refused to attempt to alter retrospectively. Any effect that FCC Ruling #2 might have on the amount of reciprocal compensation due for ISP-bound traffic, beginning as of the date of the ruling's issuance, is a completely different issue and something for the parties and the IURC, if necessary, to address in different proceedings. However, the prospective effect of FCC Ruling #2 does not change the fact that Ameritech may have improperly withheld reciprocal compensation for, at least, the several years prior to FCC Ruling #2, which expressly left existing reciprocal compensation agreements in place.[7]

 We now turn to applying Indiana contract law principles in an analysis of the Ameritech–Time Warner interconnection agreement. "In absence of ambiguity, it is not within the function of the courts to look outside the instrument to arrive at the intention of the parties." *McCae Mgmt. Corp. v. Merchants Nat'l Bank & Trust Co. of Indianapolis,* 553 N.E.2d 884, 887 (Ind.Ct.App.1990), *trans. denied.* "In most cases, construction of a written contract is a question of law for the court, with summary judgment being particularly appropriate." *Id.* If the con-

**7.** A recent decision from a federal district court has also emphasized the prospective-only effect of FCC Ruling #2. *See Verizon* *Maryland, Inc. v. RCN Telecom Services, Inc.,* —— F.Supp.2d ——, ——–——, 2003 WL 1063703 at ** 14–15 (D.Md. March 5, 2003).

tract is reasonably susceptible of more than one construction, ambiguity exists making summary judgment inappropriate, unless the ambiguity arises not because of extrinsic facts but by reason of the language used. *Id.* A contract is not ambiguous simply because a controversy exists where each party favors a different interpretation. *Northern Indiana Commuter Transp. Dist. v. Chicago SouthShore & South Bend R.R.*, 744 N.E.2d 490, 496 (Ind.Ct.App.2001), *trans. denied.* "In interpreting a written contract, the court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties." *R.R. Donnelley & Sons, Co. v. Henry–Williams, Inc.*, 422 N.E.2d 353, 356 (Ind.Ct.App. 1981). Words with a particular meaning will control general terms where both cannot stand together. *McCae Mgmt. Corp.*, 553 N.E.2d at 887. It is well settled in Indiana that unless the contract provides otherwise, the laws in existence at the time and place of the making of a contract are a part of the contract. *Essex Group, Inc. v. Nill*, 594 N.E.2d 503, 508 (Ind.Ct.App. 3 Dist.1992).

We find no ambiguity in the Ameritech–Time Warner interconnection agreement. Section 5.11 of the agreement is entitled "Reciprocal Compensation Arrangements—Section 251(b)(5)." R. p. 50. Section 5.11.1 states that "Ameritech and [Time Warner]'s compensation for transport and termination on their respective networks of all Local Traffic exchanged between [Time Warner] and Ameritech shall be determined as set forth in the Pricing Schedule." *Id.* " 'Reciprocal Compensation' is As Described in the Act." R. p. 45. " 'Local Traffic' means local service area calls as defined by the [IURC]." R. p. 43. The IURC has defined "local service area" in pertinent part as "[t]he area within which telephone service is furnished customers under a specific schedule of exchange rates and *without toll charges.*" Ind. Admin. Code tit. 170, r. 7–1.1–2(21) (emphasis added). Ameritech admitted in its answer to Time Warner's complaint that it "charges customers calling ISPs local or toll rates appropriate to the distance that their call travels to the ISP." R. pp. 207–08. Time Warner's complaint only sought reciprocal compensation for "local calls from Ameritech's end user customers to customers of Time Warner Communications, including customers of Time Warner Communications that are ISPs." R. p. 17.

 We conclude from a plain reading of the Ameritech Time Warner interconnection agreement that "Reciprocal Compensation" was utilized as a general term, simply acknowledging the parties' duties to provide for such compensation under the 1996 Act. As the Seventh Circuit observed in *Worldcom,* "The Act simply sets out the obligations of all local exchange carriers to provide for reciprocal compensation. . . . The Act clearly does not set out specific conditions which one party could enforce against the other. The details are left to the parties, or the [state] commissions, to work out." 179 F.3d at 573. Here, the parties expressly provided the specific condition that reciprocal compensation was due on "Local Traffic" as measured by "local service area calls as defined by the [IURC]." The phrase "Local Traffic," which has a particular defined meaning, controls the general phrase "reciprocal compensation" to the extent "Local Traffic" in the contract conflicts with and provides for more "reciprocal compensation" than is minimally required by the 1996 Act. *See McCae Mgmt. Corp.*, 553 N.E.2d at 887.

We agree with the Seventh Circuit that it is "quite telling . . . that in the agreement[ ], the parties specifically granted to

the [IURC] the right to define local traffic for reciprocal compensation purposes." *Worldcom Tech. Inc.*, 179 F.3d at 574. In fact, we hold that this is conclusive evidence of the parties' intent. By providing for reciprocal compensation on "Local Traffic," and by defining "Local Traffic" as it is defined by the IURC, which in turn clearly includes ISP traffic when the customer pays no additional toll for such a call, ISP traffic by default is "local" under the interconnection agreement. We believe it is clear that the parties here tied their general reciprocal compensation duties to the more specific and definite benchmark of reciprocal compensation applying to whatever the IURC defined as "Local Traffic" at the time the agreement was executed. Thus, we agree with the IURC that in order for ISP traffic to be excluded from reciprocal compensation requirements, there had to have been an explicit exclusion of such traffic from "Local Traffic" within the interconnection agreement itself. There is no such exclusion.

Because Ameritech relies heavily upon it, we will briefly discuss the FCC's decision in *Starpower Communications v. Verizon Virginia*, 17 F.C.C.R. 6873, 2002 WL 518062 (2002). First, we observe that the FCC in that case analyzed the interconnection agreements at issue solely as a matter of Virginia state contract law, not as a matter of federal law, after that state's utility regulatory commission declined to resolve Starpower's and Verizon's dispute. *Id.* at ¶ 24. As such, we need not accord deference to the FCC's ruling in the case, which was based on Virginia common law contract interpretation. Second, the interconnection agreements at issue in *Starpower* contained language arguably invoking the "end-to-end" jurisdictional analysis for ISP-bound traffic that is absent from the interconnection agreement here. The FCC primarily relied upon this lan-

guage in holding that the parties did not intend for ISP-bound traffic to be subject to reciprocal compensation. *Id.* at ¶¶ 26–28. The FCC also reached this conclusion in the face of a wealth of evidence that ISP-bound traffic was considered "local traffic" for a myriad of other purposes at the time the interconnection agreements were executed and "local traffic" was supposed to be as defined by the state utility regulatory commission in one of the challenged agreements, which would have included ISP-bound traffic. *Id.* at ¶¶ 33–38. Commissioner Martin in dissent additionally pointed out the D.C. Circuit Court of Appeals' rejection of the FCC's attempt to use an "end-to-end" jurisdictional analysis to justify excluding ISP-bound traffic from reciprocal compensation requirements. The FCC did not provide any analysis as to why the state commission's definition of "local traffic" was not controlling on the reciprocal compensation issue.

Although the FCC in *Starpower* stated that it "consistently has concluded that ISP-bound traffic does not fall within the scope of traffic [reciprocally] compensable under section 251(b)(5)" as a justification for its decision, it failed to mention that it had not done so until February 1999 in FCC Ruling # 1, or for over three years after the Telecommunications Act of 1996 was passed and well after the interconnection agreements at issue both in *Starpower* and here were signed. *Id.* at ¶ 31. Nor did the FCC acknowledge that it had expressly stated in FCC Ruling # 1 that "its historic 'policy of treating ISP-bound traffic as local for purposes of interstate access charges would, if applied in the separate context of reciprocal compensation, *suggest that [reciprocal] compensation is due for that traffic.*'" *Southwestern Bell Tele. Co. v. Public Util. Comm'n of Texas*, 208 F.3d 475, 486 (5th Cir.2000) (emphasis and alteration in original). For all these

reasons, we decline to reach the same conclusion with respect to the Ameritech Time Warner interconnection agreement as the FCC did with respect to the Starpower Verizon Virginia interconnection agreements.

It is abundantly clear that the FCC has been attempting to "save" ILECs from their failure to explicitly exclude ISP-bound traffic from reciprocal compensation requirements in interconnection agreements executed with CLECs in the wake of the 1996 Act. As the FCC has noted, there are sound policy reasons for doing so: many CLECs are distorting the purpose of the 1996 Act by entering local telephone markets primarily or solely with the intention of servicing ISPs and "free-riding" on reciprocal compensation for calls to ISPs paid by ILECs without paying any reciprocal compensation in return, because ISPs receive a huge volume of incoming calls but rarely, if ever, make outgoing calls themselves.[8] Nevertheless, the FCC has also repeatedly noted that ILECs are bound by the contracts they entered into with CLECs, with any wholesale change in the compensation regime for ISP-bound traffic to occur only when new interconnection agreements are negotiated. As a matter of contract law, it is evident that the interconnection agreement

between Ameritech and Time Warner unambiguously requires reciprocal compensation for ISP-bound traffic. Resolution of this issue did not require the weighing of conflicting extrinsic evidence, making a summary disposition of the case appropriate. *See McCae Mgmt. Corp.*, 553 N.E.2d at 887. Thus, we affirm the decision of the IURC, even after reviewing that decision de novo.

### Conclusion

We conclude that the interconnection agreement between Ameritech and Time Warner unambiguously provides for reciprocal compensation for ISP-bound traffic, in accordance with the interconnection agreement's clearly and explicitly tying reciprocal compensation to "Local Traffic" and the IURC's definition of "local service area calls." We affirm the decision of the IURC.

Affirmed.

BAILEY, J., and ROBB, J., concur.

---

**8.** The relatively "free ride" that many CLECs are receiving may be more glaring when an ILEC such as Ameritech has a work force and long-standing presence in a state or community and, by virtue of the 1996 Act, is forced to share its telephone line infrastructure with and receive relatively modest compensation from companies with little physical presence in that community.